IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JANUARY 1997 SESSION

FILED

September 19, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9601-CC-00011 |
| | ) | |
| | ) | Sullivan County |
| v. | ) | |
| | ) | Honorable Frank L. Slaughter, Judge |
| | ) | |
| EDWARD A. HUDSON, | ) | (Rape of a Child) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Stephen M. Wallace
District Public Defender
   and
Richard A. Tate
Assistant District Public Defender
P.O. Box 839
Blountville, TN 37617-0839

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
      and
Robin L. Harris
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493


H. Greeley Wells, Jr.
District Attorney General
      and
Barry P. Staubus
Assistant District Attorney General
P.O. Box 526
Blountville, TN 37617-0525

OPINION FILED:_____

CONVICTION AFFIRMED; SENTENCE MODIFIED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Edward A. Hudson, appeals as of right from his conviction by a jury in the Sullivan County Criminal Court for rape of a child, a Class A felony. As a Range I, standard offender, he received a twenty-year sentence and was fined $30,000. The defendant contends that the evidence is insufficient to convict him of rape and that his sentence is excessive. We affirm the defendant's conviction and modify his sentence.

The defendant was charged with sexually penetrating a six-year-old girl while he was a guest in her family's home on the night of December 12, 1994. At trial, Officer Rick Mowell of the Bristol Police Department testified that he went to the hospital to investigate the case at around 10:10 p.m. on December 13. He said that he interviewed both the victim, A.P., and her mother, Debra Quillen, separately. He said that he gathered evidence for a rape kit and the victim's panties. He recalled that he followed the victim and her mother to the house where they lived where he took several photographs and collected some paper towels and the victim's comforters and bed sheets. The comforters from the victim's bed and photographs of the victim's bedroom and a couch that was in the living room were introduced into evidence.

Officer Mowell testified that he met with the defendant at around 3:00 p.m. the next day, December 14, at the Kingsport Police Department. He recalled that the defendant waived his rights and agreed to speak with him. He said that he prepared a statement of what the defendant told him and the defendant signed it. He read the statement to the jury. In relevant part, the statement says,

> Monday night I stayed at Brian Quillen's House in Bristol TN.
> . . . Brian, Debbie, [A.P., and her sister] were the only other
> people at the house. Me and Brian sat around and drank a
> few beers. Monday the kids were still up when I got there.
> Debbie didn't drink. She went to bed before Brian did. Then
> Brian went to bed. I went to bed about 12:00 midnight and

2

slept on the couch. I went to [A.P.'s] bedroom and leaned down beside her. I fingered [A.P.'s] vagina only for a few minutes. While I was fingering her, I was masturbating with my left hand. I ejaculated on the bed beside [A.P.] I was drunk and felt sick after I did it. When I ejaculated I held my hand over the end and didn't think I got any on the bed. I held it and wiped it on some paper towels. I then went back and got in the bed on the couch.

Officer Mowell testified that Detective Harold Gilreath of the Kingsport Police Department was present when he read the statement to the defendant and the defendant signed it. Officer Mowell recalled that the statement originally said that the defendant laid down beside the victim but that he changed the statement after the defendant told him he did not lie next to the victim but instead leaned beside her. Officer Mowell testified that the defendant did not request that any other changes be made to the statement.

Officer Mowell said that after he took the defendant's statement, he transported the defendant to the Regional Medial Center in Bristol for a rape kit to be performed on him. He said that the defendant agreed to submit to a rape kit to show that no penile penetration occurred. Officer Mowell testified that while he and the defendant were en route to the hospital, the defendant held up his index finger and touched it with his thumb and said, "Man, I don't know how I tore her. It was that much if any."

On cross-examination, Officer Mowell testified that the defendant told him that he could not read well. He said that he told the defendant about the evidence against him and told the defendant that the defendant's best friend wanted to kill the defendant. Although Officer Mowell admitted that he did not write exactly what the defendant told him when he took the defendant's statement, he said that the statement was a summary of the discussion he had with the defendant. Officer Mowell testified that he did not recall whether the defendant asked him about the meaning of some of the words in the statement. However, after defense counsel showed him a note he had

3

written about his interview with the defendant, he concluded that the defendant must have asked him about the meaning of some of the words in the statement. Officer Mowell denied telling the defendant that he could go back to work if he signed the statement. Officer Mowell initially testified that the defendant was not wearing handcuffs while he was being transported to Bristol, but he later stated that the defendant was wearing handcuffs. He recalled that the defendant was calm while he was at the hospital, but he said that the defendant told him later that he did not deserve to live because of what happened.

The victim testified that the defendant was her daddy's friend. She said that he came into her room and kicked her in her "private". She said that she screamed and the defendant kicked her again and put his hand over her mouth. She recalled that the room was dark but that she knew that the defendant's knee was in her "privates". She said that the only place the defendant touched her with his hand was on her face. She described her "private" as the area in the middle of her legs that was covered by her panties. She said that she noticed blood in her panties after school the next day and told her mother's Aunt Nell about what happened.

Mark Mason and Harold Gilreath, criminal investigators with the Kingsport Police Department also testified. Officer Mason said that he saw the defendant sign a rights waiver form before Officer Mowell took his statement. Officer Gilreath testified that he was present when Officer Mowell read the statement to the defendant and asked him to sign it. He recalled that the statement was corrected after the defendant asked that the word "laid" be changed to "leaned." Officer Gilreath said that he notarized the defendant's signature on the statement after the defendant swore to it.

The victim's Great Aunt Ivanell Chapman testified that she watched the victim before and after school on December 13, 1994. She recalled that the victim told

her that she had blood in her panties and that the defendant had kicked her with his knee. She said that the victim did not volunteer the information until she asked her about it.

Debra Quillen, the victim's mother, testified that the defendant was her husband's friend. She said that he had been to her house many times and had spent the night on her couch before December 12th. She said that the defendant usually slept on the couch when he spent the night but that he may have slept in the victim's sister's room once or twice. She recalled that on December 12th, the defendant and her husband talked while she put the six-year-old victim and the victim's younger sister to bed. She explained that the victim's bedroom is next to the living room. She said that she went to bed at 9:30 p.m. and that her husband came to bed fifteen or twenty minutes later. She said that they left their bedroom door open but that it was closed when she awoke the next morning.

Debra Quillen testified that on the morning of December 13th, the defendant was sleeping on the couch when she left to take the two girls to her aunt's house. She said that when she returned to pick up the girls that evening, she took the victim into the bathroom and saw blood on her panties. She said that the victim had never had any vaginal discharges or female problems in the past and that she took the victim to the emergency room.

Brian Quillen, the victim's stepfather, testified that he and the defendant had been friends for twenty years. He said that the defendant had spent the night on the couch at his house before and that he told the defendant he could spend the night there on December 12th. He recalled that he and the defendant drank a couple of beers that night before he went to bed. He said that he left the defendant sitting in the dining room of the house and that he left his bedroom door open when he went to bed.

5

He said that the defendant seemed sober while he was at the house that night and that he did not see the defendant take any drugs. On cross-examination, Brian Quillen testified that although the defendant usually slept on the couch when he spent the night, he may have spent the night in a bedroom in the house once or twice.

Dr. Paul Joseph Derden was on duty in the emergency room of the Bristol Regional Hospital and Medical Center when Debra Quillen came in with the victim at 9:17 p.m. on December 13, 1994. He recalled that the victim told him that her father's friend "put his thing in my thing" and also told him that her father's friend put his knee in her "frog." The victim told Dr. Derden that it hurt and that she screamed when it happened but that no one heard her or came to help her.

Dr. Derden said that he examined the victim and discovered an abrasion in the perineal area around the opening of her vagina with a small amount of bleeding present. He also noticed that her hymen was torn. He said that the victim's injuries were consistent with a digital penetration of the vaginal area or consistent with penetration by some other small object that would apply a lot of force to a small area. He said that the victim's injuries were not consistent with a person's knee being placed in the vaginal area. He explained that an adult falling on the child would likely cause bruising, instead of tears and abrasions. On cross-examination Dr. Derden admitted that he did not know for certain what object caused the victim's injuries. He also explained that his examination of the victim caused the victim to bleed slightly but that he saw evidence that the victim had also bled before the exam.

Dr. Judy Fischer, a specialist in obstetrics and gynecology, testified that she examined the victim on December 21, 1994. She said that the victim had a tear in her hymen that was consistent with digital penetration or penetration by some other object that was near the size of a finger. She testified that she did not believe that the

6

victim's injuries could have been caused by a knee or by an accident on a playground. Although Dr. Fischer said it was possible that one could inflict on oneself injuries like those the victim received, she considered it unlikely because tearing of the tissue in such a manner would be painful.

The defendant testified that he did spend the night with the Quillens on the night in question. However, he said that he did not digitally penetrate the victim or ejaculate on paper towels. He recalled that he had drunk eight beers before he arrived at the house that night and that he drank another two beers with Brian Quillen. He said that he went to the living room to watch T.V. after Brian went to bed. He recalled that he "passed out" on the couch and awoke a few hours later and went to use the bathroom. He said that he was still intoxicated when he was returning from the bathroom and took a wrong turn into the victim's bedroom. He said that the room was dark and that he fell on top of the victim. He said that he did not think anything about the victim being in her bed when he first approached it because she and her sister often slept together. He said that both he and the victim were surprised when he fell onto the bed. He said that the victim yelled and that he fell back onto the floor. He said that he then identified himself to the victim and asked her if she was okay. He testified that the victim said that she was alright and that he returned to the bathroom and got sick. He said that on his way back to the couch, he again asked the victim if she was alright.

The defendant said that he had taken some nerve pills and smoked some marijuana the day he talked to Officer Mowell about the case. He testified that Officer Mowell did not believe him when the defendant told him that he had fallen on the victim. The defendant said that his discussion with Officer Mowell turned into an argument because the defendant disagreed with what Officer Mowell had written in the statement. He said that the officer told him that he had to sign the statement. The defendant said that he argued with the officer and told him that he did not want to sign the statement

7

because it was not accurate. According to the defendant, the officer responded by asking him what was in the statement that he did not say and by reading one line of the statement. The defendant recalled that the officer changed the one line but did not change the rest of the statement.

The defendant said that he finally signed the statement because Officer Mowell told him that he would be free to go and would not hear anything else about the case until the grand jury met. The defendant explained that he did not believe that there would be any proof to support an indictment. He said that he signed the statement because he thought that he would never make it to trial or spend a day in jail. He also said that he was eager to speak to Brian Quillen. He recalled that he was depressed and cried after he signed the statement because Officer Mowell told him that his friend wanted to shoot him. The defendant also testified that his hands were cuffed behind his back while Officer Mowell was taking him to the hospital. He denied telling the officer that he did not know how he tore the victim and denied gesturing with his hands.

The defense also called Officer Mowell to testify. The officer admitted that he found a small amount of marijuana on the defendant the day he took the defendant's statement but said that he did not charge the defendant with it. Officer Mowell denied arguing with the defendant when he took the defendant's statement and said that the defendant only requested one change to the statement. He said that the defendant did not tell him that he had fallen on the victim. Although the defendant did tell him that he had been drinking that night, Officer Mowell said that the defendant never indicated that he was so intoxicated that he could not find his way from the bathroom to the living room. Also, when the defendant told him about being sick, Officer Mowell understood that the defendant was sick because of what had happened. Officer Mowell also testified that he only sent paper towels that he found next to the

couch in the living room for testing, although there were other paper towels in the house.

T.B.I. Agent Raymond A. Depriest testified that the victim's panties and both of the comforters from the victim's bed tested negative for semen and positive for human blood. He said that he could not determine the blood type of the blood found on one of the comforters but that the blood on the victim's panties and the other comforter was the same type as that of the victim. He said that the victim's sheet and pillowcases and the paper towels that were submitted to him tested negative for blood and semen. He explained that semen stains should remain forever if they are not touched, washed, or otherwise removed. He said that he could not determine the age of a bloodstain but that after six months or a year blood stains may be more difficult to test because a chemical in the blood degrades.

The state called Kelly Annette Jones as a rebuttal witness. She testified that she was the registered nurse who administered a rape kit to the defendant. She recalled that the defendant was very cooperative and did not appear to be under the influence of drugs or alcohol while she was administering the kit. She also remembered that the defendant's hands were handcuffed in front of him.

I

In his first issue, the defendant contends that the evidence against him is insufficient to support his conviction for rape of a child because the victim never testified that he sexually penetrated her but instead said that she was sure that the defendant kicked her with his knee. Although the defendant recognizes that two doctors testified that the victim's injuries were consistent with digital penetration and could not have been caused by a knee, the defendant points out that the doctors did not testify as to what object actually caused the injuries. He also notes that Dr. Fischer admitted that

she could not tell when the injuries occurred. The defendant also asserts that the statement he signed is unsupported by the facts.

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." T.C.A. § 39-13-522 (Supp. 1996). "Sexual penetration" includes any intrusion of any object or body part into the genital or anal openings of another. T.C.A. § 39-13-501(7).

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Viewing the evidence in this light, we conclude that sufficient evidence supports the defendant's conviction. Officer Mowell testified that the defendant admitted digitally penetrating the victim. The victim identified the defendant as the person who caused her injuries, and the victim's mother testified that the victim was six years old at the time. Both Dr. Derden and Dr. Fischer testified that the victim's injuries were consistent with digital penetration. Based on these facts, the jury was justified in concluding beyond a reasonable doubt that the defendant committed rape of a child.

**II**

10

Next, the defendant challenges the length of his sentence. Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the

potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210 (1990); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range unless there are enhancement factors present. T.C.A. § 40-35-210(c) (1990).[1] Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors, and then reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e) (1990). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210 (1990), Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

With the exception of the presentence report, no evidence was presented at the defendant's sentencing hearing. The presentence report reflects that the defendant has prior convictions for public intoxication, driving on a revoked license, and two other traffic offenses. The report states that the then thirty-year-old, single defendant has an eighth-grade education and has admitted that he has a history of drug and alcohol abuse. According to the report, the defendant was employed by the City of Kingsport as a member of a paving crew at the time of his arrest. Although the defendant reported that he has held various other construction jobs, the report states that his employment history could not be verified. The report also includes a statement that the defendant submitted insisting that he is innocent.

At the conclusion of the sentencing hearing, the trial court made the following findings:

---

[1] For Class A felonies committed on or after July 1, 1995, the presumptive sentence is the midpoint of the range. See T.C.A. § 40-35-210(c) (Supp. 1996).

12

I find you have a history of various varieties of unsocial conduct. You apparently do not seem to realize the consequence of what you have been convicted of doing according to statements made by various persons in the probation report and the Officer in general. You took advantage of a position of trust, one of trust and confidence being permitted to stay in a home with small children. Stand up. I find you guilty as the jury did. You're fined thirty thousand dollars ($30,000). You're rendered infamous. You lose all rights of citizenship as a Tennessee citizen. I order you to serve twenty (20) years in the Department of Corrections.

The defendant contends that the presumption of correctness that usually accompanies a sentence imposed by a trial court, see T.C.A. §§ 40-35-401(d) and -402(d), does not apply in this case because the trial court did not follow the principles and procedures of the Sentencing Act. The defendant argues that the trial court failed to begin its analysis with the presumptive sentence. He asserts that the trial court only found one enhancement factor, an abuse of a position of private trust, see T.C.A. § 40-35-114 (15), and that the presence of that enhancement factor does not justify his twenty-year sentence.

We agree with the defendant that the trial court should have been more explicit regarding its sentencing process and findings. Yet, the trial court's comments reflect that it enhanced the defendant's sentence based upon his history of criminal behavior and his abuse of a position of private trust. See T.C.A. § 40-35-114(1) and (15).

With respect to the defendant's history of criminal behavior, the presentence report states that the defendant has been convicted of public intoxication, driving on a revoked license, and two other traffic offenses. In addition, the report reflects that the defendant admitted that he has a history of illegal drug use, including the use of marijuana, cocaine, and valium. Based on these facts, the trial court was justified in concluding that the defendant had a history of criminal behavior.

13

However, we are bound by our supreme court's decision in State v. Kissinger, 922 S.W.2d 482 (Tenn. 1996), to conclude that the trial court improperly enhanced the defendant's sentence based upon his abuse of a position of trust. In Kissinger, the court articulated the standard for determining the existence of a position of trust solely in terms of the defendant and victim. The court gave the following description of the requisite position of trust :

> The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally, or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

.
Kissinger, 922 S.W.2d at 488. Applying this standard, the court determined that factor (15) applied to Kissinger's sentences for aggravated rape and aggravated sexual battery because he had been like a surrogate father to his victims and had been trusted by their mother to protect and care for them.

The court distinguished Kissinger's case from that of Guy Phelan Roberson. Roberson was convicted of the aggravated rape of a girl who was eight years old. The only relationship between him and the victim's parents was that he was the father of the victim's step-father's niece's boyfriend. He had planned to spend the night in the victim's home on the night of the offense because he did not have transportation to his house. In refusing to apply factor (15) to Roberson's sentence, the supreme court noted that he was a casual visitor in the home and that there was no proof that suggested that he visited frequently or that the victim or other children at the home were placed in his care. Because the record failed to establish that Roberson occupied "any relationship to [the victim] that promoted confidence, reliability or faith in him," the court held that factor (15) could not be used to enhance his sentence. Id. at 489.

14

The record in this case reflects that the defendant was a frequent visitor to the Quillen home based on the relationship he shared with the victim's mother and step-father, but it fails to show that the defendant occupied a position of trust with respect to the victim. Although T.C.A. § 40-35-114(15) does not specify that the position of trust must be solely between the victim and the defendant, under Kissinger, our inquiry with respect to the application of factor (15) must end with our determination that the record does not establish that the defendant "stood in a relationship to the victim that promoted confidence, reliability, or faith." Id. Thus, application of factor (15) to the defendant's sentence was inappropriate under Kissinger.

In this respect, we believe the supreme court should expand Kissinger's holding in the context of a defendant who abuses the trust of a parent or guardian of a minor child to commit a crime against the child. A parent or child's custodian has a legal duty to protect a minor child and to act in the best interests of that child. A six-year-old child, as in this case, has no control over who the parent or custodian allows to stay in the home, including giving the person the run of the home. In this sense, we believe that the trust placed in the defendant by the victim's custodians by which the defendant was given free access to the home, which is the victim's protective environment, includes a trust for the benefit of the victim's health and welfare that should be covered by factor (15). However, we are bound by Kissinger.

The state contends that the trial court should also have enhanced the defendant's sentence based upon the vulnerability of the victim because of her age and upon the defendant's history of unwillingness to comply with conditions of a sentence involving release into the community. See T.C.A. § 40-35-114(4) and (8). However, neither of these factors are supported on the record before us. Although factor (4), involving a particularly vulnerable victim, may be applied to enhance the sentence of a defendant convicted of rape of a child, in this case the state has not met its burden of

proving that the victim had limitations that made her particularly vulnerable. <u>See</u> <u>State v. Adams</u>, 864 S.W.2d 31, 35-36 (Tenn. 1993).

Also, we do not believe that the record before us supports enhancement of the defendant's sentence based upon his inability to comply with conditions of a sentence involving release in the community. The only proof in the record that arguably supports application of this factor is a paragraph in the presentence report that states that the defendant admitted that he was placed in a juvenile home after violating a probationary sentence as a juvenile and that his juvenile records are unavailable because they have been expunged. The circumstances surrounding the alleged probation violation are not fully before us, and expungement of the defendant's juvenile records reflects ultimately successful compliance with the conditions that were placed upon him. We refrain from applying factor (8) in this case.

Beginning with the presumptive sentence of fifteen years and increasing the defendant's sentence based upon the one applicable enhancement factor, his slight history of criminal behavior, we modify the defendant's sentence to sixteen years. The judgment of the trial court is affirmed in all other respects.

_____
_____Joseph M. Tipton, Judge

CONCUR:

_____
Gary R. Wade, Judge

_____
William M. Barker, Judge

16